IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
April 16, 2015 Session


CLEAN HARBORS ENVIRONMENTAL SERVICES, INC. v. STATE OF
TENNESSEE

Appeal from the Tennessee Claims Commission
No. K201213931    Robert N. Hibbett, Commissioner, TN Claims Commission

_____

No. M2014-01136-COA-R3-CV – Filed May 18, 2016
_____


This appeal arises from a contract dispute.  The Tennessee Department of Environment and Conservation ("TDEC") contracted with a third party for the collection and disposal of certain types of waste.  The contract required the waste to be disposed of within the United States.  TDEC claimed the contractor allowed waste to move outside the United States and, as a result of the alleged contract violation, recouped a portion of the contract payments by "short-paying."  The contractor filed a complaint with the Tennessee Claims Commission to recover the recouped payments.  On cross-motions for summary judgment, the Claims Commission granted summary judgment in favor of the contractor but denied its request for pre-judgment interest. Although for purposes of summary judgment it assumed that some waste collected by the contractor left the country, the Claims Commission found such a breach by the contractor to be immaterial.  TDEC and the contractor both appeal.  We affirm the grant of summary judgment to the contractor, although on different grounds; we reverse the denial of pre-judgment interest.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Claims Commission
Affirmed in Part, Reversed in Part, and Remanded.**

W. NEAL MCBRAYER, J., delivered the opinion of the Court, in which FRANK G. CLEMENT, JR., P.J., M.S., and RICHARD H. DINKINS, J., joined.

Herbert H. Slatery III, Attorney General and Reporter; Andreé Sophia Blumstein, Solicitor General; Michael Markham and William J. Marett, Jr., Senior Counsel, for the appellant, State of Tennessee.

Jeffrey W. Melcher, Atlanta, Georgia, for the appellee, Clean Harbors Environmental Services, Inc.

**OPINION**

**I. FACTUAL BACKGROUND**

In 2005, Clean Harbors Environmental Services, Inc. responded to a request for proposals issued by TDEC for the collection and disposal of household hazardous waste. The parties subsequently entered into a written contract for the collection and disposal of eighteen types of household hazardous waste, including electronics scrap material or e-scrap.[1] The initial term of the contract was from August 1, 2005, to July 31, 2008.

The contract obligated Clean Harbors to arrange waste pickup, conduct collection events, and transport waste to a recycling or disposal facility. Of particular import to this appeal, TDEC had to approve the disposal facility and no waste was to leave the United States. The contract provided that Clean Harbors,

> shall treat and/or dispose of all Household Hazardous Waste and school chemicals (if not recycled by [Clean Harbors]) at an appropriate facility approved in writing by the State. No wastes accepted by [Clean Harbors] may be disposed in a Subtitle D landfill without express written approval from the State and no such wastes may leave the United States of America without prior written approval from the State.

The contract also obligated Clean Harbors to recycle, reuse, or properly dispose of all waste within thirty days of waste acceptance. With its invoices, Clean Harbors submitted "[c]opies of the manifests under which the wastes [included in the invoices] were shipped off site and signed certificates of disposition from the final disposal or recycling facility."

On September 9, 2005, Clean Harbors proposed using Supreme Asset Management Recovery ("SAMR"), located in New Jersey, as a disposal facility for e-scrap, and TDEC approved the selection. Clean Harbors began transporting e-scrap[2] to SAMR without

---

[1] According to TDEC, "electronics scrap material" includes computers, computer monitors, flat screen monitors, cathode ray tube (CRT) monitors, computer mice, keyboards, printers, scanners, copiers, and the like. However, the parties' contract does not specify what is deemed "electronics scrap material."

[2] Clean Harbors transported household hazardous waste from collection events to its facility in Greenbrier, Tennessee. From there, Clean Harbors transported waste to various facilities depending on waste type.

2

incident for almost three years. Clean Harbors' agreement with SAMR required SAMR to maintain a complete set of records pertaining to performance of its services and gave Clean Harbors the right to both audit its records and inspect its facilities. However, the agreement did not prohibit SAMR from exporting waste received from Clean Harbors. An audit conducted by Clean Harbors prior to execution of the agreement showed that SAMR did in fact export e-scrap out of the country.

Following media reporting on the exportation of e-scrap outside the United States, participants at the household hazardous waste collection events began questioning the disposal of e-scrap collected. In response to these inquiries, in April 2008, TDEC began investigating Clean Harbors' disposal of e-scrap. TDEC devised a worksheet to obtain information from both Clean Harbors and SAMR about their handing of e-scrap. TDEC's objective was to follow the e-scrap through the entire recycling chain.

Among other things, TDEC received documents indicating SAMR shipped glass cullet[3] to "SAMTEL" in India. SAMTEL used the glass to make picture tubes for television sets in India. TDEC also obtained bills of lading showing SAMR shipped "glass for recycling" and "CRTs" to L.G. Philips Display Brazil, Ltda, in Brazil.[4] Ultimately, Clean Harbors was unable to provide documentation showing where e-scrap collected in Tennessee went beyond SAMR, and TDEC was unable to trace Tennessee e-scrap from SAMR to a foreign country.

Despite its investigation, TDEC never moved to rescind its approval of SAMR as a disposal facility. TDEC concluded, however, that Clean Harbors' inability to document where Tennessee e-scrap went after delivery to SAMR constituted a breach of TDEC's contract with Clean Harbors. TDEC exercised its option to extend its contract with Clean Harbors, and on November 24, 2008, TDEC informed Clean Harbors of its intent to recoup amounts it had previously paid Clean Harbors for the collection and disposal of e-scrap unless Clean Harbors could document the disposition of materials sent to SAMR. TDEC claimed the right to recoup under the parties' contract.

By letter dated May 18, 2009, counsel for TDEC wrote Clean Harbors stating that, "[d]espite our overall excellent working relationship, Clean Harbors has for the past several months failed to provide our agency with documentation that electronic waste has received

---

[3] "Cullet" is an industry term for furnace-ready recycled glass. *Glass Recycling Facts*, GLASS PACKAGING INST., http://www.gpi.org/recycling/glass-recycling-facts (last visited May 5, 2016).

[4] In the proceedings before the Claims Commission, Clean Harbors disputed whether the bills of lading describing the freight as "CRTs" were actually complete CRTs as opposed to glass cullet from what once were CRTs.

proper disposition as required under the terms of our contract." TDEC threatened to recoup from future payments the total amount paid to Clean Harbors for e-scrap from May 2006 through the fall of 2008. Alternatively, TDEC offered that Clean Harbors could withdraw "from SAMR an amount of its e-waste equivalent to all the e-waste collected at Tennessee events" and "then provide and document proper disposition of that e-scrap."

TDEC, as it threatened, recouped $382,606.98 for its payments to Clean Harbors. TDEC calculated the recoupment amount by multiplying the tonnage of all e-scrap Clean Harbors collected, not just glass and CRTs, by the unit cost Clean Harbors charged TDEC under the contract. TDEC did this despite not being of the "opinion or estimation that 100% of [the e-scrap collected by Clean Harbors and transported to SAMR] went out of the country."

## II. PROCEDURAL HISTORY

Clean Harbors filed a claim with the Division of Claims Administration on June 12, 2012. *See* Tenn. Code Ann. § 9-8-402 (Supp. 2015). When the Division of Claims Administration failed to act within ninety days, it automatically transferred the claim to the Tennessee Claims Commission on September 4, 2012. *Id.* § 9-8-402(c).

In its complaint filed with the Claims Commission, Clean Harbors sought recovery of all amounts recouped by TDEC plus interest based on claims of breach of contract, unjust enrichment/*quantum meruit*, and open account. TDEC moved to dismiss the unjust enrichment/*quantum meruit* and open account claims based on sovereign immunity. In response, Clean Harbors filed an amended complaint in which it asserted only breach of contract and *quantum meruit* claims.

Clean Harbors filed a motion for summary judgment on November 26, 2013. In its motion, Clean Harbors argued that, based on the undisputed material facts, it did not breach its contract with TDEC. Alternatively, Clean Harbors argued that, if it did breach the contract, the breach was not material or TDEC suffered no damages as a result of the breach. TDEC responded and filed a cross-motion for summary judgment on January 31, 2014.

By order entered on May 30, 2014, the Claims Commission granted Clean Harbors' motion for summary judgment and denied TDEC's motion. The Claims Commission awarded Clean Harbors damages of $382,606.98. Later Clean Harbors moved for an award of pre-judgment interest under Tennessee Code Annotated § 9-8-307(d) (Supp. 2015).[5] The

---

[5] Tennessee Code Annotated § 9-8-307(d) provides as follows:

4

Claims Commission denied the request for pre-judgment interest, finding that, in light of the breach, "[t]he amount of compensation due to [Clean Harbors] is not so certain as to make it advisable to award pre-judgment interest."

On appeal, TDEC asserts the Claims Commission erred in: (1) granting summary judgment in favor of Clean Harbors and concluding it did not materially breach the contract; and (2) denying TDEC's motion for summary judgment. Clean Harbors contends the Claims Commission erred in denying its request for pre-judgment interest.

## III. ANALYSIS

Regular proceedings before the Claims Commission are governed by the Tennessee Rules of Civil Procedure where applicable. Tenn. Code Ann. § 9-8-403(a)(1) (Supp. 2015); Tenn. Comp. R. & Regs. 0310-01-01-.01 (2016). Under those rules, summary judgment may be granted only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Tenn. R. Civ. P. 56.04; *see also Rye v. Women's Care Ctr. of Memphis, MPLLC*, 477 S.W.3d 235, 250 (Tenn. 2015), *petition for cert. filed*, 84 U.S.L.W. 3547 (U.S. Mar. 15, 2016) (No. 15-1168); *Martin v. Norfolk S. Ry. Co.*, 271 S.W.3d 76, 83 (Tenn. 2008); *Penley v. Honda Motor Co.*, 31 S.W.3d 181, 183 (Tenn. 2000). The party moving for summary judgment bears the burden of demonstrating both that no genuine dispute of material fact exists and entitlement to a judgment as a matter of law. *Martin*, 271 S.W.3d at 83.

When faced with cross-motions for summary judgment, the trial court "must rule on each party's motion on an individual and separate basis." *CAO Holdings, Inc. v. Trost*, 333 S.W.3d 73, 83 (Tenn. 2010).

> With regard to each motion, the court must determine (1) whether genuine disputes of material fact with regard to that motion exist and (2) whether the party seeking the summary judgment has satisfied Tenn. R. Civ. P. 56's standards for a judgment as a matter of law. Therefore, in practice, a cross-

---

If the claimant is successful with any claim filed with the claims commission after January 1, 1985, the state shall pay such interest as the commissioner may determine to be proper, not exceeding the legal rate as provided in § 47-14-121. In contract actions, interest may be awarded, but if the rate of interest is provided in the contract, the award of interest shall be at that rate.

Tenn. Code Ann. § 9-8-307(d).

5

motion for summary judgment operates exactly like a single summary judgment motion.

*Id.* (citations omitted). For the respective competing motions, the court must view the evidence in the light most favorable to the opposing party and draw all reasonable inferences in the opposing party's favor. *See Bain v. Wells*, 936 S.W.2d 618, 622 (Tenn. 1997). The court is not to "weigh" the evidence when evaluating a motion for summary judgment, or substitute its judgment for that of the trier of fact. *Martin*, 271 S.W.3d at 87; *Byrd v. Hall*, 847 S.W.2d 208, 211 (Tenn. 1993). The denial of a cross-motion for summary judgment does not necessitate the granting of the competing cross-motion. *CAO Holdings, Inc.*, 333 S.W.3d at 83.

### A. GRANT OF SUMMARY JUDGMENT TO CLEAN HARBORS

Other than tax appeals, an appeal from the regular docket of the Claims Commission is governed by the same rules and procedures as an appeal from the civil trial court. Tenn. Code Ann. § 9-8-403(a)(1). Therefore, we review the summary judgment decision as a question of law. *Martin*, 271 S.W.3d at 84; *Blair v. W. Town Mall*, 130 S.W.3d 761, 763 (Tenn. 2004). Based upon a de novo review of the record, we must make our own determination of whether the requirements of Tennessee Rule of Civil Procedure 56 have been met. *Rye*, 477 S.W.3d at 250; *Blair*, 130 S.W.3d at 763.

"In a breach of contract action, claimants must prove the existence of a valid and enforceable contract, a deficiency in the performance amounting to a breach, and damages caused by the breach." *Fed. Ins. Co. v. Winters*, 354 S.W.3d 287, 291 (Tenn. 2011). The parties do not dispute the existence of a valid and enforceable contract. However, both parties claim a breach by the other. "Ordinarily, a party who first materially breaches may not recover under the contract." *Madden Phillips Constr., Inc. v. GGAT Dev. Corp.*, 315 S.W.3d 800, 813 (Tenn. Ct. App. 2009).

The Claims Commission assumed[6] for the purposes of summary judgment that some

---

[6] The Claims Commission based its assumption upon "circumstantial evidence." However, TDEC's evidence that e-scrap or constituent parts of e-scrap left the country does not appear substantively admissible and, therefore, should not have been considered by the Claims Commission. Evidence filed "to support or to oppose a motion for summary judgment must be admissible." *Shipley v. Williams*, 350 S.W.3d 527, 564 (Tenn. 2011) (Koch, J., concurring in part and dissenting in part).

> To be admissible, evidence at the summary judgment stage must satisfy the requirements of the Tennessee Rules of Evidence, as well as any other requirements controlling the admissibility of particular types of evidence. Thus, evidence that would be substantively

of the e-scrap collected in Tennessee left the United States after Clean Harbors transported the e-scrap to the disposal facility, SAMR. The Claims Commission then proceeded to analyze whether such a "breach" would be material, concluding that it would not. The Claims Commission's analysis, therefore, rested upon the conclusion that e-scrap being shipped outside of the United States by an approved disposal facility constituted a breach of the contract between TDEC and Clean Harbors. We disagree.

When, as is the case here, "facts are undisputed or conclusively established or can lead to only one reasonable answer, the question whether there has been a breach of a contract is one of law for the court." 17B C.J.S. *Contracts* § 1034 (2015) (footnotes omitted); *see also Guiliano v. Cleo, Inc.*, 995 S.W.2d 88, 95 (Tenn. 1999) ("The interpretation of a contract is a matter of law that requires a *de novo* review on appeal."). Before the Claims Commission, TDEC and Clear Harbors supported their respective arguments that the other breached by advocating conflicting interpretations of their contract. In resolving such conflicts, "our task is to ascertain the intention of the parties based upon the usual, natural, and ordinary meaning of the contractual language." *Guiliano*, 995 S.W.2d at 95. We attempt to construe "[a]ll provisions in the contract . . . in harmony with each other, if possible, to promote consistency and to avoid repugnancy between the various provisions of a single contract." *Id.*

Clean Harbors argued that, once it transported e-scrap to a TDEC approved disposal facility within the United States, it satisfied the contractual provision that "[n]o such wastes may leave the United States of America without prior written approval from the State." TDEC, on the other hand, argued that the provision required e-scrap to remain in the United States through the entire recycling chain. Only Clean Harbors' interpretation is consistent with the language of the contract.

Read as a whole, the contract only required Clean Harbors to use a disposal facility within the United States. In the same clause prohibiting waste from leaving the United States, the parties also agreed that Clean Harbors would "treat and/or dispose of all Household Hazardous Waste . . . at an appropriate facility approved in writing by the State." TDEC does not dispute SAMR was a disposal facility located in the United States that it approved in writing. Importantly, the contract did not address recycling by the disposal facility or a requirement to follow constituent parts of waste through the recycling process.

An interpretation that Clean Harbors must also ensure that constituent parts of waste remain in the United States through the recycling chain after leaving a disposal facility would

---

inadmissible at trial would likewise be inadmissible at the summary judgment stage.

*Id*. at 565 (Koch, J., concurring in part and dissenting in part).

7

conflict with or render other parts of the contract impossible to perform. *See Maggart v. Almany Realtors, Inc.*, 259 S.W.3d 700, 704 (Tenn. 2008). For instance, under the contract, waste disposal facilities were not considered subcontractors. As Clean Harbors was responsible for all work performed by subcontractors, omitting disposal facilities from the definition of subcontractors would be at odds with TDEC's interpretation of the contract.

TDEC's interpretation is also difficult to square with the timing requirements of the contract. The contract required Clean Harbors to "ensure that all waste accepted by [Clean Harbors] is recycled, reused, or properly disposed within thirty (30) days from when [Clean Harbors] accepts the waste." If it was required to follow the waste through the entire recycling chain, Clean Harbors might never satisfy the thirty day requirement.

Because the contract only required Clean Harbors to use a disposal facility within the United States, we conclude that Clean Harbors provided appropriate documentation of e-scrap disposal. TDEC claimed that Clean Harbors was required to provide documentation showing where Tennessee e-scrap went beyond SAMR. A TDEC representative testified she would have liked to see the following documentation:

> [S]hipping . . . to SAMR, Tennessee scrap [at SAMR] being . . . sorted into commodity types . . . that need[] to go to a landfill [or] . . . recycling. [E]ach of those commodities then being shipped to perhaps a metals recycler or to a plastics recycler or to a glass-to-glass recycling facility and . . . total volumes shipped to those locations.

However, the parties were bound by the terms of their contract, not some hidden, subjective intent of TDEC. *Cone Oil Co. v. Green*, 669 S.W.2d 662, 664 (Tenn. Ct. App. 1983).

The contract required Clean Harbors to provide the following documentation:

> The Contractor shall submit monthly invoices, in form and substance acceptable to TDEC with all of the necessary supporting documentation, prior to any payment. Such invoices shall be submitted for completed units of service or project milestones for the amount stipulated. Copies of the manifests under which the wastes were shipped off site and signed certificates of disposition from the final disposal or recycling facility must accompany the invoice for all wastes included in the invoice.

The record reflects that Clean Harbors complied with the contract by providing the necessary signed certificates of disposition from the final disposal or recycling facility. The record further reflects that TDEC accepted waste manifests and certificates of disposition from

SAMR for nearly three years. We conclude there was no breach by Clean Harbors.

## B. DENIAL OF PRE-JUDGMENT INTEREST

The Claims Commission has the authority to award a successful claimant pre-judgment interest "as the commissioner may determine proper." Tenn. Code Ann. § 9-8-307(d). "An award of prejudgment interest is within the sound discretion of the trial court and the decision will not be disturbed by an appellate court unless the record reveals a manifest and palpable abuse of discretion." *Myint v. Allstate Ins. Co.*, 970 S.W.2d 920, 927 (Tenn. 1998).

In *Myint v. Allstate Insurance Co.*, our Supreme Court articulated the following standard for awarding pre-judgment interest.

> Simply stated, the court must decide whether the award of prejudgment interest is fair, given the particular circumstances of the case. In reaching an equitable decision, a court must keep in mind that the purpose of awarding the interest is to fully compensate a plaintiff for the loss of the use of funds to which he or she was legally entitled, not to penalize a defendant for wrongdoing.

*Id.* The *Myint* standard has been described as a "different, more flexible, standard for considering prejudgment interest claims." *Scholz v. S.B. Int'l, Inc.*, 40 S.W.3d 78, 83 (Tenn. Ct. App. 2000).

> Addressing the two most common reasons for denying prejudgment interest, the Court first held that "uncertainty of either the existence or amount of an obligation does not *mandate* a denial of prejudgment interest." Second, the Court overruled all previous cases suggesting that prejudgment interest should not be awarded if the claim is reasonably disputed.

*Id.* (citations omitted).

In this instance, the Claims Commission erred in not granting pre-judgment interest. The Claims Commission determined it would be unfair to grant pre-judgment interest because, although Clean Harbors acted in good faith and did not materially breach the contract, Clean Harbors did not follow *every word* of the contract. Additionally, the Claims Commission found the amount to be too uncertain to justify an award of pre-judgment interest. As discussed above, we conclude that Clean Harbors did not breach the contract. Further, we find the amount of the obligation of TDEC to Clean Harbors certain. Fairness dictates awarding pre-judgment interest in this instance to compensate Clean Harbors for the

loss of the use of the money it should have received earlier.

## IV. CONCLUSION

Because we conclude the Clean Harbors did not breach its contract with TDEC, [7] we affirm the Claims Commission's grant of summary judgment in favor of Clean Harbors and the denial of TDEC's motion. We reverse the denial of pre-judgment interest. This matter is remanded for further proceedings consistent with this opinion.

_____
W. NEAL MCBRAYER, JUDGE

---

[7] We may affirm a grant of summary judgment on different grounds than those relied upon by the trial court. *Hill v. Lamberth*, 73 S.W.3d 131, 136 (Tenn. Ct. App. 2001)